**Guenevere Nelson-Melby**
**NELSON-MELBY LAW, PLLC**
**P.O. Box 2588**
**Tucson, AZ 85702**
**TEL:  (520) 288-4688**
*GUENEVERE NELSON-MELBY, AZBAR #024745*
*nelsonmelbylaw@gmail.com*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO.: CR22-01830-JAS-BGM |
| Plaintiff, | &   CR20-00568-JAS-BGM |
| v. | **DEFENDANT'S SENTENCING AND DISPOSITION MEMORANDUM** |
| Martin Saucedo-Lares, | |
| Defendant, | |

The defendant respectfully requests a sentence of 24 months, with time for his supervised release violation to be served concurrently with time for the reentry offense.

Such a (not insignificant) sentence would provide a sufficient deterrent and would promote respect for the immigration laws of the United States, while not unduly and unnecessarily burdening the United States judicial system with the unnecessary costs of an unneeded and prolonged incarceration. The Pre-Sentence Report's recommended sentencing suggestion is "greater than necessary to serve

the objectives of sentencing." *Kimbrough v. U.S.*, 552 U.S. 85, 91 (2007), and a variance below the advisory guideline would adequately "...reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense", pursuant to Title 18, U.S.C. Section 3553(a)(2)A).

Other than some old (almost 10 years) driving offenses (including a DUI), Mr. Saucedo-Lares' only recent offenses are attempted reentries.  He poses no threat to people in the United States.

I.     Although Mr. Saucedo-Lares Has Spent Most Of His Life In The United States, He Will Not Return After Deportation In This Case.

Mr. Saucedo-Lares was brought to the United States at the age of 11. He attended Greenway Middle School and North Canyon High School in Phoenix. He has 5 U.S. citizen children, all of whom live in Arizona.

His family came from Mexico to escape the cycle of poverty. They knew that the options that they had for survival in the Mexico would only lead to more poverty. For example, Mr. Saucedo-Lares had begun working at the age of 9 to help the family survive. His parents thought that if they brought him here, he would at least have a chance for an education. He made it to the 9th grade, which almost certainly more education than his family could have afforded in Mexico.

Life here was good for him and he loves the United States. He lived, loved, and worked for decades in United States and he has strong family ties here, but he also understands that he cannot return.

When he returns to Mexico, he has a plan. He is a skilled welder who can make windows and tables and chairs (he has many other skills related to manual labor).  He plans to set up a welding business just across the border in Nogales, to export for U.S. companies. He expects that this business will be successful because his family will send him money to get all of the equipment to start a solid business. His girlfriend, a U.S. citizen, has an apartment for them both in Mexico and they will live there, together. She will cross the border to work in the U.S. and further help with household expenses.  He hopes that together they can earn enough money to build a house in Mexico.

He is not going to return to the United States because he knows that he cannot be here legally, and he is tired of incarceration. He states, "I want to do things right."  He addresses his family ties by noting that, "my children can come see me in Mexico."  His mother has begged him not to return, and his respect for her is an additional motivation.

As noted in the presentence report, a few years ago, a family and life-changing event occurred when his son was beaten and permanently incapacitated

while in the infamous Maricopa County jail.1 After the shock of the event, Mr. Saucedo-Lares quit drinking or using any mind-altering substances. He recognizes that previous to that time, his drinking had affected others.  But, he notes, "I am not the same. . . .I want to be a different person. . . I do not have the desire to drink." He wants to live a tranquil family life.

II.   <u>U.S. Laws Allow For A Reduced Sentence For Illegal Reentries When The Defendant Was Culturally Assimilated Into The United States.</u>

U.S. Laws allow for a reduced sentence for illegal reentries when the defendant was culturally assimilated into the United States. The "Commentary" to USSG § 2L1.2 was amended in 2010 to include the following "Application Note":

> "8. Departure Based on Cultural Assimilation.--There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation. Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant. [Emphasis supplied]

---

1 A federal judge found in 2008 that severe overcrowding in three of the jail's facilities had created extremely dangerous environments by significantly increasing the potential for violence among inmates. "Judge Calls Maricopa County Jail Conditions Unconstitutional." American Civil Liberties Union press release October 22, 2008.

https://www.aclu.org/press-releases/judge-calls-maricopa-county-jail-conditions-unconstitutional.

"In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States."

*Reason for Amendment:* This amendment addresses when a downward departure may be appropriate in an illegal reentry case sentenced under § 2L1.2 (Unlawfully Entering or Remaining in the United States) on the basis of the defendant's cultural assimilation to the United States.

Even prior to the enactment of the forgoing amendment, the Ninth Circuit had recognized that "that a sentencing court may depart on the basis of cultural assimilation if it finds that the defendant's circumstances remove his case from the heartland of cases governed by the relevant individual guidelines and the Guidelines as a whole. *United States v. Lipman*, 133 F.3d 726, 731 (9th Cir.1998).

Clearly, the circumstances of this case evidence that a reduction based upon Mr. Saucedo-Lares's cultural assimilation to the United States is appropriate and warranted.

As noted above, Mr. Saucedo-Lares came to the United States when he was only 11 years old. He attended school here.  Other than occasional brief trips to

Mexico, Mr. Saucedo-Lares had not and still has not lived for any significant period of time anywhere in Mexico.  His family and children all live here.  He is bilingual.

Mr. Saucedo-Lares submits that his cultural assimilation mitigates his culpability for the crime of illegal reentry because his reentry was motivated by his cultural, emotional and psychological ties to the United States. The cultural, emotional and psychological ties were developed as a result of his parents' decision to bring him to the United States when he was 11. Moreover, this reentry attempt was motivated by his desire to see his citizen children.

Mr. Saucedo-Lares submit that his case is not the typical reentry case because his return was motivated by familial concern rather than economic incentives. In other words, his is not the typical "reentry defendant" whose primary motivation is economic and lacks cultural or family ties to the United States.

Instead, Mr. Mr. Saucedo-Lares submits that as a result of his cultural assimilation, his prior deportation created a substantial hardship to him because he had no roots in Mexico and he was banished from the only country he had known as an adult and in which all his immediate family, resided. Mr. Saucedo-Lares's case is outside the "heartland" of other similarly situated cases and the Court should give due consideration to his cultural assimilation in determining the appropriate sentence for him.

/

III.  <u>8 US Code § 1326 Is An Iteration Of The Undesirable Aliens Act Of 1929,
Which Was Conceived, Drafted, And Enacted To Discriminate Against
Mexicans.</u>

As the court considers the appropriate punishment in this case, it is important to note, in passing, that there is substantial historical evidence that 8 USC §1326 has a deeply problematic and racist history.  The predecessor to §1326 (the Undesirable Aliens Act of 1929, the first law criminalizing immigration offenses), "was conceived, drafted, and enacted by white supremacists out of a belief that the 'Mexican race'"[2] would destroy the racial purity of the United States. Legislators, in debate leading up to its passage, referred to Mexicans as "mongrels" and "peons."[3] They claimed Mexicans were "poisoning the American citizen."[4] They sought to keep the country's blood "white and purely Caucasian."[5] In 1952, the 1929 law was re-codified in 8 USC §1326, which actually made the criminal penalties even harsher.  President Truman, while vetoing the legislation, mourned

_____

[2] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[3] *See infra* at 8, 10, 11, 12, 13, 17.

[4] *See infra* at 15, 17.

[5] *See infra* at 13.

the fact that the Immigration Act, of which §1326 was a part, "would intensify the repressive and inhumane aspects of our immigration procedures." 6

Mr. Saucedo-Lares does not intend to minimize his own responsibility for crossing the border. However, he asks the court to also consider the fact that the only law he violated was passed due to racist animus, and has been used primarily against people like himself for almost 100 years. Simply put, the equities demand that this problematic history should be considered as the court considers an appropriate sentence.

IV.    Sentencing Considerations.

District Courts have statutory authority to depart from the Federal Sentencing Guidelines when "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" is present in a case before the Court at the time of sentencing. *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed. 2d 392 (1996); *See also*, 18 U.S.C. §3553(b); UNITED STATES SENTENCING GUIDELINES ("USSG") §5K2.0.

---

6 Truman, Harry S., Veto of Bill To Revise the Laws Relating to Immigration, Naturalization, and Nationality. June 25, 1952.

https://www.trumanlibrary.gov/library/public-papers/182/veto-bill-revise-laws-relating-immigration-naturalization-and-nationality

This authority allows the court to be "...free to consider [a defendant's] individual circumstances." *United States v. Estrada-Plata*, 57 F.3d 757, 763 (9th Cir. 1995). Additionally, the sentencing court may consider "without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited [by the guidelines or other law]." USSG §1B1.4.

Finally, as noted by the Supreme Court:

> The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice. In this respect, the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system. This, too, must be remembered, however. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

*Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 2053, 135 L.Ed. 2d 392.

///

//

/

V.      Conclusion.

Mr. Saucedo-Lares  respectfully requests a sentence of 24 months, so that he

can swiftly return to Mexico to start his business

DATED this 9th day of December, 2022.


Guenevere Nelson-Melby
Attorney for Defendant